## Mutual Life Insurance Company of New York *v.* Bamford, Appellant.

Argued April 20, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Louis Vaira,* with him *Paul N. Barna,* for appellant.

*William H. Eckert,* with him *Richard G. Miller* and *Smith, Buchanan & Ingersoll,* for appellee.

OPINION BY CUNNINGHAM, J., July 15, 1938:

Appellant was the beneficiary in a reinstated contract of insurance issued by the appellee company upon the

life of her husband, Mark H. Bamford, in the amount of $2,000; she has appealed from a decree of the court below, sitting in equity, cancelling and rescinding the policy upon the ground that its reinstatement had been procured by fraud.

The fraud charged in the bill was that the insured, in making his written and signed application for the reinstatement of the policy (which had lapsed for non-payment of a premium) and while being examined by appellee's medical examiner, knowingly and willfully made false answers to material questions relative to physical examinations, laboratory tests and consultations with and treatments by physicians, since the due date of the premium in default, and concerning the condition of his health during that period.

Preliminary objections were filed to the bill upon two grounds: (a) That appellee had a full, complete and adequate remedy at law; and (b) that appellant had instituted in the common pleas an action at law upon the policy on the same day the preliminary objections were filed. These objections were overruled and trial was had before HUGHES, J., sitting as a chancellor. The court below, in banc, approved and adopted his findings of fact and conclusions of law and entered a final decree cancelling the policy and directing appellee, upon its surrender, to pay over to the estate of the insured the premium of $101.24, with interest, received by it in connection with the application for reinstatement. We permitted appellant to present her appeal from that decree in forma pauperis.

The twenty-five assignments of error filed in this court raise two general questions for our consideration and disposition: First, whether the record contains any competent evidence supporting the chancellor's findings of fact to the effect that the reinstatement was procured by fraud, and, if so, whether the law has been properly applied to those findings: Second, whether the bring-

ing of appellant's action in assumpsit upon the policy, after service of the bill, ousted the jurisdiction of the court below to proceed in equity to the final determination of the case.

1. The policy was dated September 4, 1933, and lapsed because the annual payment of $101.24, due on September 4, 1934, was not paid. It was provided in section 11 of the contract that it might be "reinstated at any time within five years after default in payment of premium upon evidence, satisfactory to the company, of the insured's then insurability and the payment of all overdue premiums." On January 5, 1935, the insured made application, in writing, for the reinstatement of the policy and paid the overdue premium. The application was made upon a blank entitled, "Application for Establishing or Reinstating Policy—With Medical Examination." Printed upon the paper were a number of questions to be propounded to the applicant by the appellee's medical examiner followed by blank spaces for the insertion of the answers of the insured. The application blank also included a provision by which the insured agreed for himself and every person who then had, or might later have, any interest in the policy "that the foregoing statements and answers, and the statements and answers made to the company's medical examiner, are true and are offered to the [company] as an inducement to ...... reinstate ...... said policy, and further that the same are material to the risk which the company is asked to assume by ...... reinstating said policy." It is conceded the answers (written with pen and ink) to the printed questions on the face of the application are in the handwriting of Dr. J. Add. Sprowls, one of appellee's medical examiners.

The second question is subdivided into three paragraphs designated (a), (b), and (c). We are here concerned with question 2(c). In so far as applicable it

reads: "Has the insured ...... since the original due date of the first premium now in default ...... Had any illness, disease, impairment of health, surgical operation, or physical examination or laboratory test, or been prescribed for, treated by or consulted a physician, surgeon or practitioner? (If so, give details of each and the name of each physician, surgeon or practitioner.) (If none, so state)."

The answer written in the space following this question was, "Yes"; but the only illnesses, operations, or medical or surgical treatments detailed in the written explanation of the affirmative answer to the question were that on June 29, 1934, he was treated and operated upon in West Penn Hospital, Pittsburgh, by a Dr. Baily, for appendicitis and for a hernia, with complete recovery in July, 1934, and without "any remaining effects." The date of these operations was prior to the "due date" of the defaulted premium. The application bore a certificate signed by Dr. Sprowls to the effect that the "statements were read, approved and signed by the insured in [his] presence." The insured's application for reinstatement was approved by the home office of appellee on January 8, 1935, and the policy reinstated as of January 10th.

On the following day the insured entered the Homeopathic Hospital at Pittsburgh where he was operated upon by Dr. F. S. Morris for cancer of the stomach, which had existed for at least three months, and died on January 22, 1935—seventeen days after signing his application for reinstatement. Proofs of death were received by the appellee on February 5, 1935. On the 25th of the following month it tendered return of the overdue premium received in connection with the application, with interest thereon, which tender was refused. Proceedings in equity for the cancellation of the policy were commenced on April 4, 1935.

Facts, established by uncontroverted evidence and

having a material bearing upon the issue whether the insured's answers to question 2(c), as above quoted, were false and known to him to be false, may be thus summarized: In October, 1934, while the policy was lapsed, the insured consulted Dr. Carl E. Miksch on three different occasions, complaining of indigestion, weakness, and loss of weight. In the latter part of that month Dr. Miksch found his patient's stomach had dropped out of place; about the middle of the following month the insured began wearing, at the suggestion of Dr. Miksch, an abdominal belt with a pad on it. On December 26, 1934, Dr. Miksch was called to the residence of the insured where he found him in a seriously weakened condition, confined to bed and vomiting blood. By that time the insured also had a protrusion of about one inch caused by some form of abdominal tumor. Suspecting cancer of the stomach, Dr. Miksch advised the insured to go to Dr. William B. Ray at the Allegheny General Hospital in Pittsburgh for an X-ray examination. On January 3, 1935, only two days prior to making application for the reinstatement of his policy, the insured went from his home in Donora to Pittsburgh and had an X-ray examination, lasting some six hours and including the eating of a barium meal. Dr. Ray concluded insured had been suffering from cancer of the stomach for several months and so reported to Dr. Miksch.

It does not appear from the testimony that the insured had been advised prior to the making of his application for reinstatement that he was suffering from cancer. Dr. Miksch testified that during his above mentioned professional visit on December 26, 1934, he informed appellant of his suspicion that her husband's ailment was cancer of the stomach. There was evidence, however, that on January 7, 1935, while the application for reinstatement was pending, Dr. Miksch communicated to the insured, as well as to appellant, the

contents of Dr. Ray's report and sent the insured to Dr. Morris for an operation. As the chancellor based no specific finding on this testimony, we merely call attention in passing, to *Stipcick v. Metropolitan Life Ins. Co.*, 277 U. S. 311, 72 L. ed. 895, 48 Sup. Ct. 512, and *Gordon v. Prudential Ins. Co.*, 231 Pa. 404, 411, 80 A. 882, holding that good faith upon the part of the insured would require him to acquaint appellee, before accepting reinstatement of the policy, with the fact that he was going to a hospital for an operation.

The question whether the statements made by the insured were representations or warranties may be debatable under the language of the contract, but for the purposes of this appeal we shall give appellant the benefit of the doubt and assume appellee had the burden of showing the answers of the insured upon which it sought cancellation were not only false in fact but were also known to him to be false. "An answer known by insured to be false when made is presumptively fraudulent": *Evans v. Penn Mutual L. Ins. Co.*, 322 Pa. 547, 553, 186 A. 133, and cases there cited. In this connection, we also assume the insured had not been told by any physician, prior to his examination by appellee's medical examiner, that he had a cancer.

Granting the insured may not have known when he went to Dr. Sprowl's office to sign the application, and afford the doctor an opportunity to pass upon his "insurability," that he was afflicted with cancer, there is ample uncontroverted evidence upon the record from which the chancellor, as the sole trier of the facts, could find the insured did know he was suffering from some grave illness. No man who, within the preceding ten days, had been confined to his bed, summoned his physician, vomited blood, had a noticeable protrusion from his stomach, and had been sent to the hospital for examination, could in good faith say he had no "illness, disease, or impairment of health."

Moreover, the answer of insured in which he detailed his treatment and operations by a Dr. Baily for appendicitis and hernia in June, 1934, showed he fully understood he was being asked about consultations and treatments with and by physicians and about physical examinations and laboratory tests. The inference is inescapable that he deliberately and fraudulently concealed from Dr. Sprowls his very recent physical examinations and treatments by Dr. Miksch and the laboratory tests by Dr. Ray. Whatever he may have thought about the nature of his disease, these matters, concerning which he was specifically asked, were absolutely known to him and could not possibly have been forgotten. The obvious purpose of the insured was to conceal from appellee's representatives sources of information which would have caused the prompt rejection of his application. The perpetration of such fraud as was shown in this case renders inapplicable here many of the cases cited and relied upon by counsel for appellant —for example, *Prudential Ins. Co. v. Kudoba et al.,* 323 Pa. 30, 186 A. 793, as to the effect of the "passing" of an applicant for insurance by the insurer's medical examiner.

What we have said thus far has been upon the assumption that the questions upon the application were read to the insured by Dr. Sprowls and the answers thereto correctly filled in by the doctor. There was a conflict in the testimony upon this point. Dr. Sprowls died several days prior to the beginning of the trial. Appellant testified she went with the insured to Dr. Sprowls' office and that the only persons present during the examination were the insured, Dr. Sprowls and herself. As appellant was the only survivor, the situation was open for her to give whatever version she might see fit of the circumstances under which the application was written and signed. She testified (testimony pp. 63-65), in substance, that when question 2(c) was

read to the insured by Dr. Sprowls her husband told the doctor of the operations in 1934 for appendicitis and hernia and that the name of the surgeon was Dr. Dunmire and not Dr. Baily, as recorded by Dr. Sprowls. Appellant further testified that when asked by Dr. Sprowls "if he had seen a doctor recently" her husband also told him about his treatments by Dr. Miksch, the vomiting of blood, the pains in his abdomen, the wearing of the belt, and the X-ray examination. The credibility of this witness was, of course, for the chancellor. In his adjudication he directed attention to the fact that although the signing of the application by the insured was admitted in the pleadings, appellant, after the case had been called for trial, desired to offer an amendment to the effect that the signature appearing upon the application was not that of the insured, but the proposed amendment was withdrawn when it was suggested that if her husband had not signed the application there would be no evidence that he ever asked to have the policy reinstated.

In the course of his discussion the chancellor, after referring to the contention that Dr. Sprowls practiced a fraud upon the insured and his beneficiary in failing to fill out the application in accordance with the answers made by the insured, remarked: "Margaret P. Bamford, if this policy is held valid, is the beneficiary thereunder. It is on her testimony alone that the facts in the application for reinstatement are attempted to be contradicted. She claims that she and her husband truthfully related all of the facts as to his condition, that the doctor placed them on a pad and thereafter filled in the application for reinstatement without setting forth any of them therein. This could be for no other purpose than for assisting Mark H. Bamford to obtain insurance when he was in no condition to pass a medical examination, and the fraudulent act of Dr. Sprowls in failing to reveal to his company the informa-

tion sought by his examination could have been for no other purpose than to benefit Mark H. Bamford and his wife. If he were to so have done, the only fair inference that we could draw would be that Margaret P. Bamford being a party to that, should not be allowed to recover by her own wrongful act. On no other theory could it appear that Dr. Sprowls, who was the medical examiner for the insurance company, would not correctly fill out the application in a truthful manner, he having long been engaged in this type of work."

In the course of the opinion, written for the court below by the chancellor and dismissing appellant's thirty-three exceptions to his findings, this language appears: "The only contradictory testimony to the whole situation was that offered by the defendant herself, who was a most interested witness. Dr. Sprowls had died two days before the trial of the case, and the defendant then seems to have had the afterthought that the deceased did not sign the reinstatement application or that it was simply a blank when he signed it ...... The defendant nowhere claimed in her pleadings that the reinstatement application was left blank when the deceased signed it. We, therefore, were entitled to give little or no weight to the testimony offered by the defendant in view of her vacillating position when this case came on for hearing. The defendant claims her unfortunate position arose because the medical examiner placed false answers in the insurance application. The burden was upon her to show this: *Suravitz v. Prudential Ins. Co.*, 261 Pa. 390, 398, 399, [104 A. 754]; *Applebaum v. Empire State Life Assurance Society*, 311 Pa. 221, 226, [166 A. 768]; and she clearly did not meet the burden."

Again, in explanation of his refusal to find, as requested by counsel for appellant, that the insured had made full disclosures to Dr. Sprowls of his then physical condition and of his treatments by Doctors Miksch

and Ray, the chancellor remarked: "To have made such a finding, this court would have had to have accepted the testimony of Margaret P. Bamford, which, in view of its unreliability, we entirely rejected."

Our examination of the record has convinced us that the court below was fully justified in rejecting all of appellant's testimony relating to the preparation of the application. As there was ample competent evidence supporting the findings, made by the chancellor and adopted by the court, in banc, and as the law has been correctly applied to those findings, none of the assignments relating to this branch of the case can be sustained.

2. Upon the second proposition—whether the bringing by appellant of her action in assumpsit upon the policy after service of the bill ousted the jurisdiction of the court below to proceed in equity—we have this factual situation. The policy contained an incontestable clause to the effect that, except for non-payment of premiums, the insurer could not contest its liability after one year from the date of issue, unless the insured died within such year, in which event the contestable period would become two years. It is conceded by counsel for appellant in his brief that the present proceeding was instituted within the contestable period of the policy as reinstated. A period of approximately two and one half months elapsed between the maturity of the policy and the institution of proceedings for its cancellation during which time appellant took no steps to enforce payment. Such a state of facts, prima facie, brings this case within the principles of law announced by us in *Prudential Ins. Co. v. Ptohides*, 122 Pa. Superior Ct. 469, 186 A. 386, cited with approval in *Smith v. State Mutual Life Assurance Co.*, 331 Pa. 1, 199 A. 358. In the Ptohides case the court below sustained preliminary objections to, and dismissed, a bill for cancellation because, in its opinion, the insurer had an

adequate remedy at law. We reversed, holding that the only effective way in which an insurer can "contest" its liability, upon the ground that its policy, or the reinstatement thereof, had been procured by fraud, is by instituting an appropriate proceeding in a court of equity for cancellation of the contract of insurance, or by defending in a court of law against a suit brought upon the policy—which proceeding must be instituted, or defense interposed, within the contestable period of the policy. See also *Prudential Ins. Co. v. Adamshick*, 122 Pa. Superior Ct. 481, 186 A. 394, and *Prudential Ins. Co. v. Ordonoff*, 122 Pa. Superior Ct. 485, 186 A. 391. The general subject was fully considered in the Ptohides case and we need not repeat what was there said.

The only difference between the case at bar and the Ptohides case is that in the present case the beneficiary, in addition to filing the preliminary objections to which we have referred, simultaneously brought her action on the policy in the common pleas. It is contended by counsel for appellant that this procedure by his client takes her case out of the scope of our decision in the Ptohides case. In the first place attention is directed to the following paragraph in our former opinion:

"As the question of the effect of an action at law by a beneficiary, brought before or after the filing of a bill for cancellation but at such a date within the contestable period as would afford the company an opportunity to file its affidavit of defense before the expiration of that period, is not now before us, we express no opinion upon it, but it seems reasonable to assume that a beneficiary could thus select his own forum."

It is then argued that as the action at law in the present case was instituted by appellant in time to permit appellee to contest its liability by filing an affidavit of defense, setting up the matters averred in its bill, before the expiration of the contestable period, the

Ptohides case should not be followed. As stated in the above quotation from our former opinion, the present question was not then involved and we expressly reserved it for consideration if and when it arose. It has now arisen and requires consideration and disposition by us. Manifestly, appellant could have "selected her own forum" by bringing suit upon this policy during the two and one half months which elapsed between the death of the insured and the filing by appellee of its bill. Tender of the premium was notice of appellee's attitude. The question remains, however, whether the bringing of her action at the same time she filed her preliminary objections ousted the jurisdiction in equity which had already attached.

One other feature of the case at bar should be kept in mind. Ten days after the bringing of the action at law appellee obtained a rule to show cause why it should not be stayed. Appellant filed an answer but took no further steps to bring the matter before the court below for adjudication. As the proceeding in equity did not come on for trial until about eighteen months later, it would be a reasonable inference that appellant elected to take her chances in a trial before a chancellor. We prefer, however, to dispose of this branch of the case upon broader grounds. Appellant's contention, has, we think, been clearly decided against her by the Supreme Court of the United States in *American Life Ins. Co. v. Stewart,* 300 U. S. 203, 81 L. ed., 605, 57 Sup. Ct. 377, in an opinion written by Mr. Justice CARDOZO, who, as appears from our opinion in the Ptohides case, had the question of what amounts to a "contest" before him while presiding as Chief Justice of the Court of Appeals of New York in the case of *Killian et al. v. Metro. Life Ins. Co.,* 251 N. Y. 44, 166 N. E. 798.

The facts under which the issue arose in the Stewart case are practically identical with those here present.

In that case the insured died approximately three months after the date of issue to him of two policies, containing incontestable clauses similar to the one involved in this case. About three months after the death of the insured the insurance company instituted proceedings in equity to cancel the policies. There, as here, the beneficiaries moved, about one month after the institution of the proceedings in equity, to dismiss the bills for want of equity and began actions at law in the same court to recover the face of the policies. It was held that equity had jurisdiction and that its jurisdiction could not be defeated or affected by the institution of the actions at law. The writer of the opinion in the Stewart case, after stating that a "contest," within the purview of an insurance contract, has generally been held to mean a contest in a court and "not a notice of repudiation or of a contest to be waged thereafter," continued:

"The argument is made, however, that the insurer, even if privileged to sue in equity, should not have gone there quite so quickly. Six months and ten days had gone by since the policies were issued. There would be nearly a year and a half more before the bar would become absolute. But how long was the insurer to wait before assuming the offensive, and how was it to know where the beneficiaries would be if it omitted to strike swiftly? Often a family breaks up and changes its abode after the going of its head. The like might happen to this family. To say that the insurer shall keep watch of the coming and going of the survivors is to charge it with a heavy burden. The task would be hard enough if beneficiaries were always honest. The possibility of bad faith, perhaps concealed and hardly provable, accentuates the difficulty . . . . . . 'Where equity can give relief plaintiff ought not to be compelled to speculate upon the chance of his obtaining relief at law.' *Davis v. Wakelee*, 156 U. S. 680, 688. To this must be

added, the danger that witnesses may disappear and evidence be lost. A remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient. *Boyce's Executors v. Grundy,* 3 Pet. 210; *Drexel v. Berney,* 122 U. S. 241; *Walla Walla v. Walla Walla Water Co.,* 172 U. S. 1; *Union Pacific R. Co. v. Weld County,* 247 U. S. 282, 287. 'It must be a remedy which may be resorted to without impediment created otherwise than by the act of the party.' *Cable v. United States Life Ins. Co.,* supra, at p. 303, [191 U. S. 288]. Here the insurer had no remedy at law at all except at the pleasure of an adversary. There was neither equality in efficiency nor equality in certainty nor equality in promptness. 'The remedy at law cannot be adequate if its adequacy depends upon the will of the opposing party.' *Bank of Kentucky v. Stone,* 88 Fed. 383, 391; cf. *Lincoln National Life Ins. Co. v. Hammer,* 41 F. (2d) 12, 16. To make a contract incontestable after the lapse of a brief time is to confer upon its holder extraordinary privileges. We must be on our guard against turning them into weapons of oppression.

"The argument is made that the suits in equity should have been dismissed when it appeared upon the trial that after the filing of the bills, ...... the beneficiaries of the policies had sued on them at law. But the settled rule is that equitable jurisdiction existing at the filing of a bill is not destroyed because an adequate legal remedy may have become available thereafter. *Dawson v. Kentucky Distilleries Co.,* 255 U. S. 288, 296; *Lincoln National Life Ins. Co. v. Hammer,* supra; *New York Life Ins. Co. v. Seymour,* supra, [45 F. (2d) 47, 48]."

In our opinion, the principles of law so clearly stated in the above quoted excerpts from the opinion of the Supreme Court of the United States in the Stewart case should be given full force and effect under the method by which we administer equity in this jurisdiction.

Their application to the facts of this case demonstrates that the court below was fully warranted in overruling appellant's preliminary objections and proceeding to a final decree. The assignments of error applicable to this branch of the case are accordingly dismissed.

Decree affirmed at costs of appellant.