## Watson *v.* Metropolitan Life Insurance Company, Appellant.

370

Argued March 4, 1941.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Rhodes and Hirt, JJ.

*John H. Collins,* of *Collins & Collins,* for appellant.

*Wm. J. Fahey,* with him *Al. J. Kane,* for appellee.

Opinion by Keller, P. J., July 18, 1941:

The action below was in assumpsit on an endowment policy of life insurance for $1,000 issued on the life of Alfred Watson. The plaintiff beneficiary was the insured's wife. It has been tried twice, resulting each time in a verdict for the plaintiff; and each time the court below has granted a new trial, because, in its

opinion, there was so much in the case from which fraud could be *inferred*, that a new trial was required in the interests of justice. At the same time the court refused to enter judgment non obstante veredicto for the defendant, holding that the principle laid down by the Supreme Court in *Evans v. Penn. Mut. Life Ins. Co.*, 322 Pa. 547, 560, 186 A. 133, applied, to wit: "Whenever disputed questions of fact are presented by conflicting evidence, whether documentary or oral, or whenever the insurer's defense depends upon the testimony of its witnesses, even though such testimony is uncontradicted, the case must be submitted to the jury, subject to the trial court's power to award a new trial as often as in its sound discretion it may think the interests of justice require"; and adding "The same principle of law applies to the present case. We have awarded a new trial on two occasions and will continue to do so if we believe the interest of justice requires."

The defendant appealed to this court from the refusal to enter judgment in its favor non obstante veredicto and seeks to obtain a ruling from us that the doctrine of 'continuing representation' will be applied in this state in its severest form; that is, that every material representation made by the insured in his application for insurance and in connection with his medical examination for insurance, will be deemed to continue as a representation by him down to the date of the delivery of the policy, unless notice of any change therefrom or exception thereto is given by the insured *to the company at its home office* and assented to by it before the policy becomes effective. It is contended that notice of such change or exception by the insured to the agent commissioned by the insurer to countersign and deliver the policy would not be sufficient. In other words, if an applicant for insurance truthfully states that he has not consulted a physician for five years prior to the date of his application, but in the

interval between the date of his examination by the company's doctor and the delivery of the policy, he should consult a physician, the policy would be avoided if he died before it became incontestable, unless he notified the insurance company, prior to the effective delivery of the policy, of his visit to the physician and had the exception noted by it on the application and the policy.

We do not understand that to be the law of Pennsylvania and refuse so to rule. This court, in *First Nat. Bank v. U. R. O. Brotherhood*, 132 Pa. Superior Ct. 320, 324-325, 200 A. 935, in substance held otherwise. See also, *Stonsz v. Equitable Life Assur. Soc.*, 324 Pa. 97, 187 A. 403, where the insured was *injured* between the date of his application and the delivery of the policy, but was permitted to recover.

In our opinion the decisions in this state go no farther than to hold that the mutual good faith which is required in a contract of life insurance will not permit a recovery where the insured intentionally withholds or conceals material changes in the condition of his health between the date of his examination by the company's physician and the delivery of the policy, of which he has knowledge, and of such a nature as to affect his insurability and make him a hazardous risk, and thus amount to a fraud on the company. See *Mutual Life Ins. Co. v. Bamford*, 132 Pa. Superior Ct. 255, 200 A. 907; *Livingood v. New York Life Ins. Co.*, 287 Pa. 128, 131-132, 134 A. 474; *Suravitz v. Prudential Ins. Co.*, 244 Pa. 582, 91 A. 495. And in such cases, the knowledge of the insured and his fraudulent intent are usually questions for the jury, subject to the power and duty of the court to grant a new trial if required in the interest of justice.

As the jury found a verdict for the plaintiff every disputed question of fact must be resolved in her favor. With that principle kept in mind we shall recite the facts which the jury would be warranted in finding.

On August 24, 1936 Alfred Watson signed a written application for insurance, or rather Part A of that application. On August 27, 1936 he was examined and passed by the company's physician as an insurable risk. In connection with that examination and forming Part B of his application, also signed by him, he made certain answers to questions asked him by the company's physician. Among them were the following, the answers being italicized:

"6. Present condition of health? *Good*

7. (a) When last sick? (Month) *August,* (Year) *1918*

(b) Nature of last sickness? *Appendectomy*

(c) How long sick? *3 weeks* ......

11. Have you had any surgical operation, serious illness or accident? If yes, give date, duration and name of ailment. *Yes. Appendectomy. Dr. L. Edwards, 1918, Wilkes-Barre Gen.*

......

17. Have you ever had any of the following complaints or diseases? .......Asthma.......Pneumonia ....... [A] *No.*

18. Have you been attended by a physician during the last five years? If yes, give name of complaints, dates, how long sick, and names of physicians. *No.*"

For the purposes of this case, the absolute truthfulness of every one of those answers is admitted.

Just preceding his signature to Part A of the application appeared the following provisions:

"It is understood and agreed: 1. That the foregoing statements and answers are correct and wholly true, and, together with the answers to questions on Part B hereof, they shall form the basis of the contract of insurance, if one be issued ......

4. That the company shall incur no liability under this application until it has been received, approved,

and a policy issued and delivered, and the full first premium stipulated in the policy has actually been paid to and accepted by the Company during the lifetime of the Applicant, in which case such policy shall be deemed to have taken effect as of the date of issue [September 3, 1936] as recited on the first page thereof."

For the purposes of this case it is admitted that all answers to the questions in Part A, likewise, were truthful.

The policy as drawn and afterwards delivered was dated September 3, 1936 and contained, among others, the following provisions:

"1. Payment of Premiums:—All premiums are payable, on or before their due dates, at the Home Office of the Company, and may be paid to an authorized agent or representative of the Company, but only in exchange for the Company's official premium receipt signed by the President, Vice-President, Actuary, Treasurer or Secretary of the Company and countersigned by such agent or representative by whom such payment is received ......

4. Entire Contract:—This Policy and the application therefor, a copy of which is attached hereto as a part hereof, constitute the entire contract between the parties, and all statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid this Policy or be used in defense of a claim hereunder unless it be contained in the application therefor ......

8. Agents:—No agent is authorized to waive forfeitures, to alter or amend this Policy, to accept premiums in arrears or to extend the due date of any premium."

Receipt for the first premium printed on the back of the policy was as follows, the insertions, etc., being italicized:

"Receipt of *$61.69*, the first premium hereunder, is hereby acknowledged

J. P. Bradley (an engraved signature)<br>
Secretary

Countersigned *9-28-1936*

(signature) *Ben Lustig*"

Lustig was the company's local agent who solicited and obtained the insurance and delivered the policy. Watson also had three industrial policies in the defendant company, collections for which were made by Lustig every Monday.

At the time of soliciting the insurance, in response to the suggestions of Watson and his wife, that they might not have the money to pay for the insurance he told them that they had thirty days after its date to pay for and accept the policy.

The company accepted the risk and *issued* the policy as of date of September 3, 1936. It is to be noted that the next payment would fall due on September 3, 1937. If accepted and paid for, it related back to its date. The insurance company would thereby be paid for the insurance risk accruing from the date of the policy.[1]

On Monday September 7, 1936 Lustig, the company's agent, presented the policy for delivery, but was told that they did not have the money ready. The same thing happened on September 14 and September 21. But on the last mentioned date they informed him they would pay him on September 28—he made his calls every Monday—within the thirty-day limit he had fixed. Up to that date (September 21) there is no evidence, or even suggestion, that the applicant was not in the same con-

---

[1] When the policy is delivered and the premium paid, the policy relates back to its date of issue as stated in it. The insured thus pays for protection during the period between that date and the date of delivery. See *Sydnor v. Met. Life Ins. Co.*, 26 Pa. Superior Ct. 521; *McDonough v. Prudential Ins. Co.*, 85 Pa. Superior Ct. 63; *Ford v. Fidelity Mut. Life Ins. Co.*, 314 Pa. 54, 170 A. 270.

dition of health as when examined and accepted for insurance.

Nor does the evidence show any change in Watson's condition of health until a physician, Dr. Donald Smith, was called to see him at his home, about ten o'clock in the morning of Sunday, September 27, 1936. From the testimony and proofs of death it may be inferred that he had a cold when he went to bed the night before. Dr. Smith found him lying on a couch in the sitting room of his apartment. He testified that Watson had an attack of bronchial asthma, brought on by a cold; that his breathing was noisy. His treatment was a hypodermic of adrenalin, and later—he thought—he gave him a second one with a little morphine. He called again at ten o'clock that night; found him slightly worse; temperature 100—[normal is 98-3/5, so his temperature was not high]. At two o'clock Monday morning he was called by telephone and found the patient much worse. His pulse was so weak he could not palpate it and his temperature was 104. His breathing was short and rapid. He testified on the trial that Watson was then suffering from pneumonia, complicated by a cerebral edema. But the doctor did not say when he arrived at his diagnosis that the patient had these diseases— whether then, or afterwards, in consequence of later events. There is no evidence whatever that he told either Alfred Watson or Mrs. Watson, this plaintiff, the nature of the former's illness. He, again, administered only a hypodermic. At seven o'clock on Monday morning, September 28, he returned and found the patient better—a little stronger—the patient could and did converse with him and took fruit juice and nourishment.[2]

---

[2] Defendant's counsel objected to the following question asked Doctor Smith—defendant's witness—on cross-examination, relating to this visit: "Q. Well, there was marked improvement in the condition of Mr. Watson between 4 A.M. and 7 A.M. on Monday is that correct? Mr. COLLINS [counsel for defendant] If the court please we object to the question as a conclusion, and lead-

He testified that the patient had bronchial pneumonia; but again there is no evidence as to when he determined it was bronchial pneumonia—his treatment up to this time had been confined to hypodermics of adrenalin, with perhaps a little morphine; and no evidence whatever that he communicated his diagnosis to Watson or his wife. He came again at eleven o'clock that morning, and at four o'clock that afternoon he sent a nurse to the house. He found Watson in an unconscious condition on Monday evening, and the latter died about 7:45 o'clock on Tuesday morning, September 29th. The attending physician, in his statement forming part of the proofs of death furnished defendant made the following answers (italicized) to the questions on the company's blank:

"6. Cause of death? *Bronchial asthma.*
Duration from personal knowledge *2 days*
Duration from history given *4 days*
Contributory or Secondary, *Broncho-pneumonia*
(Duration) *2 days* ......

9. Date of your first visit in last illness? *Sept. 27, 1936*
Date of your last visit? *Sept. 29, 1936*

10. How long had Deceased been ill when you were called to attend in last illness? *2 days*"

In the meantime, on Monday morning, September 28, about 9:45 o'clock, after the doctor had called and found his patient better, Lustig, the company's agent, called in accordance with the prior arrangement, bringing the policy. Mrs. Watson admitted him into the apartment. The entrance to the apartment from the hallway was through the bedroom. From there double doors opened

---

ing. The Court: Yes, that is leading. Mr. Fahey [counsel for plaintiff]: This is cross-examination, if the court please. The Court: That is leading. Ask him if there was any improvement." The question was proper and should have been allowed. Leading questions are always permissible on cross-examination. The able and experienced trial judge for the moment overlooked this.

into the sitting room, where Watson was lying on a couch. Mrs. Watson told the agent that her husband had a very bad cold and that they had called in a doctor. She told him she could get the money for the premium ($61.69) at the bank where she had a savings account, which represented a legacy of $800, that she had received several years before. She changed her dress, went to the bank with the agent, drew out the money for the premium, paid it to the agent, who dated and countersigned the receipt on the policy necessary for its validity and delivered it to her.

Counsel for defendant on the argument expressly disclaimed relying on any charge of fraud or bad faith on the part of Mrs. Watson, the beneficiary.

It must be kept in mind that neither the application nor the policy issued in this case contained a condition that the insured must be in sound health or good health when the policy is delivered, as is present in many policies. Had it done so, the case would be different. The only express condition precedent to the incurring of liability was that the "full first premium stipulated in the policy has actually been paid to and accepted by the Company *during the lifetime of the applicant,*" and this was complied with.

Furthermore, the policy expressly provided: "This policy and the application therefor, a copy of which is attached hereto as a part hereof, constitute the entire contract between the parties". And that means the application as signed, not as attempted to be altered and extended by the doctrine of 'continuing representation', which would, in effect, alter the date of signing so as to make it read 'Sept. 28, 1936', instead of 'August 24, 1936' and 'August 27, 1936'. It also provided, "and all statements made by the Insured [that is, in the application] shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid the policy or be used in defense of a claim hereunder unless it be contained in the application there-

for"—and that means, the application when and as made by the applicant, a copy of which is included in the policy as a part thereof. See *Sandberg v. Met. Life Ins. Co.*, 342 Pa. 326, 20 A. 2d 230; *Morris v. State Mutual Life Assur. Co.*, 183 Pa. 563, 39 A. 52; *Fisher v. Fidelity Mutual Life Assn.*, 188 Pa. 1, 41 A. 467. Hence a representation in order to avoid the policy must not only be material and false, but the applicant must also have known it was false. In other words, it must be fraudulent. Section 318 of the Insurance Company Law of May 27, 1921, P. L. 682,[3] which re-enacted the provisions of the Act of May 11, 1881, P. L. 20, would preclude an insurance company from defending on false representations in an application for insurance unless an exact copy of the application, including the representation alleged to be false, and dated in accordance therewith, was attached to and accompanied the policy: *Sandberg v. Met. Life Ins. Co.*, supra. No inference that any representation in the application continued beyond its date is permitted under that section.

Most of the cases, in other jurisdictions, which hold that a representation by the applicant for insurance that he is in sound health or good health at the time of the application continues down to the date of delivery of the policy, contained a *condition,* in either the application or policy, that the policy should not take effect, unless delivered when the person to be insured was

---

[3] Section 318 provides in part as follows:

"All insurance policies, issued by stock or mutual insurance companies or associations doing business in this State, in which the application of the insured ...... form[s] part of the policy or contract between the parties thereto, or [has] any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application as signed by the applicant ...... and, unless so attached and accompanying the policy, no such application ...... shall be received in evidence in any controversy between the parties to, or interested in, the policy, nor shall such application ...... be considered a part of the policy or contract between such parties."

in good health, or sound health, or in the same condition of health as described in the application. See notes to *Roe v. National Life Ins. Assn.*, 17 L.R.A. (N.S.) 1144, 115 N. W. 500; and *Connecticut Gen. Life Ins. Co. v. Mullen*, 43 L.R.A. (N.S.) 725, 197 Fed. 299. But in such cases, it is the *condition* that applies and prevents the policy going into effect, rather than the doctrine of continuing representation: *Connell v. Met. Life Ins. Co.*, 16 Pa. Superior Ct. 520, 529; 1 Cooley's Briefs on Insurance, p. 693; but *cf. ibid.*, p. 695.

In the present case no such condition appears in either the application or the policy and in *Barnes v. Fidelity Mutual Life Assn.*, 191 Pa. 618, 43 A. 341, 45 L.R.A. 264, even although the policy contained the condition that "The policy of insurance issued hereon shall not become binding until the first payment due thereon has been actually received by the association or its authorized agent during my lifetime and good health," a recovery was permitted under facts, otherwise, very like this one. The application was signed October 30, 1893. It contained a warranty [p. 621]: "That I am in good health and free from any and all diseases, sickness, ailments or complaints, trivial or otherwise." The applicant was admittedly in good health when the application was presented to and acted on by the insurer. The policy was issued and sent to the local agent for delivery on payment of the premium. The policy was not delivered until November 28, 1893, when the premium was paid. In the meantime, on November 25, 1893, the applicant took to his bed because of a cold he had contracted and stayed there until he died of pneumonia five days thereafter, on November 30, 1893, two days after the delivery of the policy. The plaintiff beneficiary claimed that pneumonia did not "set in" until November 29, the day after the premium was paid and policy delivered. Had the doctrine of 'continuing representation' been applicable—as contended for by the defendant here—there could have been no recovery on the

policy, for a cold which requires one to go to bed and stay there until his death, was certainly an 'ailment or complaint, trivial or otherwise', of which, in his application, he had represented that he was free. But the case was submitted to the jury on the question whether on the date of delivery of the policy he was in *good health,* as conditioned in the policy, the court instructing the jury that "A temporary or slight cold in a man of usually good health . . . . . . would not constitute unsound health." The Supreme Court affirmed the judgment on the verdict for the plaintiff, saying: "The insured need not be entirely free from infirmity or from all the ills to which flesh is heir. If he enjoys such health and strength as to justify the reasonable belief that he is free from derangement of organic functions, or free from symptoms calculated to cause a reasonable apprehension of such derangement, and to ordinary observation and outward appearance his health is reasonably such that he may with ordinary safety be insured, and upon ordinary terms, the requirement of 'good health' is satisfied . . . . . . In other words, the term 'good health', when used in a policy of life insurance, means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system. . . . . . . 'Colds are generally accompanied with more or less congestion of the lungs, and yet in such a case there is no disease of the lungs which an applicant for insurance would be bound to state': *Cushman v. Insurance Co.,* 70 N. Y. 77."

That case was followed by this court in *Horne v. John Hancock Mut. Life Ins. Co.,* 53 Pa. Superior Ct. 330, 333, which was very similar in its facts; and was cited by Mr. Justice DREW in his comprehensive discussion in *Evans v. Penn Mut. Life Ins. Co.,* 322 Pa. 547, 557, 562, 186 A. 133, and in *Adams v. Met. Life Ins. Co.,* 322 Pa. 564, 567, 186 A. 144. See also *Baer v. State Life Ins. Co.,* 256 Pa. 177, 183, 100 A. 745; *Livingood v. New York*

*Life Ins. Co.,* 287 Pa. 128, 132, 134 A. 474; *Keiper v. Equitable Life Assurance Soc.,* 159 Fed. 206 (C.C.A. 3d Circuit); *Connecticut Gen. Life Ins. Co. v. Mullen,* 197 Fed. 299 (C.C.A. 3d Circuit), 43 L.R.A. (N.S.) 725 (in that case, however, an agreement had been made by the company's agent giving the insured sixty days within which to pay the first premium; the application was signed December 7, 1909; policy issued December 9; mailed December 10; received by agent December 12, at which time insured was ill of meningitis, with which he was attacked that day and of which he died December 15. The policy was never delivered, but a finding for plaintiff was upheld); and *Eastern District Piece Dye Works v. Travelers Ins. Co.,* 234 N. Y. 441, 452, 138 N. E. 401.

The case of *Barnes v. Fidelity Mut. Life Assn.,* supra, was distinguished in *Gordon v. Prudential Ins. Co.,* 231 Pa. 404, 80 A. 882, but in the latter case there was a condition precedent—which is lacking here—that the *"policy shall not take effect* until the same shall be issued and delivered by the said company and the first premium paid thereon in full *while my health is in the same condition as described in this application."* Furthermore the policy had been delivered to the insured for inspection only, pursuant to a written memorandum signed by him agreeing that it would not be in force until the premium was paid and the company's official receipt was delivered "during my lifetime and in good health, as provided in my application upon which the above numbered policy was issued." Two days before the premium was paid the insured became ill with pleurisy, which developed into pneumonia and was so diagnosed by the family physician and a consultant, who was called in and found "his lung was in a solid congested condition, full of blood, and it was a serious condition", within two hours after the insured had sent his son with a check for the first premium, who delivered it to the agent and got the receipt therefor, without in-

forming the agent of his father's condition; and the circumstances were such as to show that the insured knew of his serious condition when he made the payment; and he died of pneumonia about two and a half days thereafter. This knowledge of the insured was referred to in *Hare & Chase v. National Surety Co.*, 49 Fed. 2d 454, and it was also pointed out there that "No question of good faith arose in the [Gordon] case. The question was merely whether the contract of insurance had become effective, and since the premium was not paid during the good health of the insured, as provided by the receipt, the policy did not become binding." In the same case—*Hare & Chase v. National Surety Co.*, supra —the court also said: "The cases imposing a duty to disclose changes in material elements of the risk, occurring between the time of the application and the issuance [or delivery] of the policy are predicated upon the applicant's fraudulent intent."

The defendant's difficulty in the present case is that it failed to show on the trial, to the satisfaction of the jury, that Watson knew at the time the premium was paid that he was in a serious condition or that he had more than a severe cold from which he had every chance of a recovery.

Anyone who has had much experience in such cases knows that in certain forms of pneumonia the attack may come on with lightning like rapidity, and what was thought to be merely a cold—see above quotation from *Barnes v. Fidelity Mut. Life Assn.*—may turn out to be a fatal case of pneumonia.

We cannot say, in the light of all the testimony, that it was established that the insured was guilty of any fraudulent conduct towards the defendant company, or that he knew that he was in such a condition as to make him a hazardous or non-insurable risk. Besides, in this case, the agent whose countersignature to the first premium receipt endorsed on the policy was necessary to make a valid delivery of the policy, was informed by

Mrs. Watson, prior to the delivery that her husband had a very bad cold and was being attended by a doctor. See *Connecticut Ind. Assn. v. Grogan*, 52 S. W. 959 (Ky.); *Ames v. Manhattan Ins. Co.*, 52 N. Y. Supp. 759—affirmed 167 N. Y. 584, 60 N. E. 1106; *Northwestern Life Assn. v. Findley*, 68 S. W. 695, (Texas); *John Hancock Mut. Life Ins. Co. v. Schlink*, 175 Ill. 284, 51 N. E. 795; *Grier v. Mut. Life Ins. Co.*, 132 N. C. 542, 44 S. E. 28; *Hardiman v. Fire Assn. of Phila.*, 212 Pa. 383, 390, 61 A. 990; *Spern v. Globe & Republic Ins. Co.*, 131 Pa. Superior Ct. 595, 200 A. 196.

We shall not discuss the cases from other jurisdictions relied on by the appellant. Many of them are based on conditions precedent in the policy as to the good health of the applicant on the date of delivery. Others are from jurisdictions which do not have statutory requirements such as section 318 of our Insurance Company Law. Still others go beyond the law as laid down by our Supreme Court and cannot be followed by us. In the case of *Stipcich v. Met. Life Ins. Co.*, 277 U. S. 311, chiefly relied on by the appellant, clause 4 of the ·policy in this case, above quoted, was omitted from the policy there involved, and the facts were such as to show that the insured knew of the change in his health materially affecting the risk; and in that case, the Supreme Court, did not apply the doctrine contended for here by appellant; for it said (p. 316): "But the reason for the rule [of good faith in insurance contracts] still obtains, and with added force, as to changes materially affecting the risk *which come to the knowledge of the insured* after the application and before delivery of the policy ...... If, while the company deliberates, *he discovers facts* which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure." (Italics added). Moreover, the directed judgment for the defendant in that case was not affirmed, but it was reversed because the court below excluded

the plaintiff's offer to show that disclosure of the applicant's condition had been made to Coblentz, the agent of the company, before the delivery of the policy, and that a visit to a second doctor had been made at Coblentz's request to confirm a prior diagnosis.

In any event, since the decisions in *Erie Railroad Co. v. Tompkins*, 304 U. S. 64, and *Ruhlin v. New York Life Ins. Co.*, 304 U. S. 202, the contract is to be construed in accordance with the law of this State, and if there is any conflict between *Barnes v. Fidelity Mut. Life Assn.*, supra, and the cases following it (including *Evans v. Penn Mut. Life Ins. Co.*, supra) and *Stipcich v. Met. Life Ins. Co.*, supra, as to which we are not convinced, we follow the decisions of the Supreme Court of this State.

We are of opinion that under all the testimony the court below would have been guilty of error, if it had entered judgment for the defendant non obstante veredicto; and that the defendant got all it was entitled to in the order granting a new trial, which will not be disturbed. See *Kerr v. Hofer*, 341 Pa. 47, 17 A. 2d 886,

Order affirmed.