# The Travelers Insurance Company v. Heppenstall Company

70

*John R. Bredin* and *Dalzell, McFall, Pringle & Bredin,* for complainant.

*Elder W. Marshall, W. A. Seifert* and *Reed, Smith, Shaw & McClay,* for respondent.

WEISS, J., June 26, 1947.—This is a bill in equity brought by The Travelers Insurance Company, a corporation, plaintiff, against Heppenstall Company, a corporation, defendant, seeking to *cancel* and *annul* a policy of life insurance in the amount of $50,000 issued August 22, 1945, upon the life of Leo A. Daines and naming defendant, Heppenstall Company, as beneficiary.

The bill also seeks to restrain defendant from bringing action at law upon said policy of life insurance.

Defendant filed an answer and the matter came on for a hearing before the court, sitting as a chancellor, on May 7, 1947.

From the testimony adduced in this proceeding, your chancellor makes the following findings:

### Findings of fact

1. The Travelers Insurance Company is a corporation organized and existing under and by virtue of the laws of the State of Connecticut, engaged in the business of insuring lives and authorized and legally registered to do business in the Commonwealth of Pennsylvania, with an office in Pittsburgh, Allegheny County, Pa.

2. Defendant, Heppenstall Company, is also a corporation with its principal place of business at Pittsburgh, Allegheny County, Pa.

3. On August 22, 1945, Leo A. Daines, as the proposed insured, signed and delivered to plaintiff an application for a policy of life insurance, naming defendant, Heppenstall Company, as beneficiary thereof.

4. Thereafter plaintiff issued its policy of insurance No. 2,329,360, dated September 13, 1945, for $50,000; upon the life of Leo A. Daines, wherein defendant was named as beneficiary.

5. The only premium paid upon said policy was the initial premium of $2,214.50, which premium was paid by the Heppenstall Company, defendant.

6. The said Leo A. Daines died on March 29, 1946, and the cause of his death was diagnosed by his attending physician as coronary thrombosis.

7. On August 7, 1946, after defendant made claim for the proceeds of the insurance policy, plaintiff tendered to defendant the amount of $2,341.92, being the initial premium paid by defendant on the policy in which it is named beneficiary, with interest thereon, claiming that said policy had been procured by Leo A. Daines by means of fraud, misrepresentation and concealment; upon said tender being rejected, plaintiff brought this bill in equity seeking to cancel and annul this policy of life insurance.

8. The said written application by Leo A. Daines for said policy contains the following questions and answers:

Q. "11. Have you had periodic or occasional health examinations?

A. "No.

Q. "Has any abnormal condition been found?

A. "No.

Q. "12. Have you ever had any special examinations such as X-rays, Electrocardiograms, sputum or blood studies?

A. "Yes.

Q. "13. Have you received:

    (a) Surgical advice or attention?

A. "Yes.

    (b) Medical advice or attention within five years?

A. "Yes.

Q. "14. Have you ever been under observation or treatment in a hospital, sanitarium or other institution?

A. "Yes.

Q. "15. Have you ever had or been told you had:

    B. Epilepsy, fits or convulsions, fainting spells, dizziness, mental disorder, paralysis, neurasthenia or nervous disorder?

A. "No.

    C. Disease of the heart, kidneys or blood vessels?

A. "No.

    D. Appendicitis, ulcer of stomach or duodenum, renal calculus or gall stones?

A. "Yes.

"18. GIVE DETAILS OF ALL AFFIRMATIVE ANSWERS APPLICABLE TO QUESTIONS 6-15F INCLUSIVE

| "Illness or Condition | Duration From   To | Compli-cations | No. of attacks | Have you recovered | Give full name and address of all physicians consulted |
|---|---|---|---|---|---|
| T&A | 1940 | None | | Yes | |
| Duodenal | Aug. 1941- | | | | |
| Ulcer | Oct. 1941 | None | | Yes | Dr. N. F. |
| Appendectomy | 1942 | None | | Yes | Fisher, Chicago, Ill. |

"19. ADDITIONAL STATEMENTS BY PROPOSED INSURED.

    9.—Duodenal ulcer—3 months—no diet since 12.—X-ray for duodenal ulcer."

9. In 1941 Dr. N. F. Fisher attended Leo A. Daines upon complaints of gas in the stomach, with burning

after eating and tentatively diagnosed that he was suffering from a duodenal ulcer. Sippy diet powders were prescribed and Daines responded perfectly to ulcer management, except that every few months he suffered from upset stomach.

10. From April 18, 1941, to May 2, 1941, Daines was a patient in hospital, under the care of Dr. Fisher, suffering from appendicitis; at Dr. Fisher's direction a surgeon removed Daines' appendix. In June 1941 Dr. Fisher caused X-ray pictures to be taken to determine whether Daines still suffered from duodenal ulcer; his diagnosis was that the ulcer had healed.

11. Dr. Fisher again attended Daines on March 17, 1943, and found symptoms of hyperacidity and indigestion; in order to confirm his findings, Dr. Fisher required Daines to have an electrocardiogram made. *Upon examining the electrocardiogram, Dr. Fisher confirmed his finding of hyperacidity, found no evidence of abnormality or pathology of Daines' heart beyond normal limits, and so informed Daines.* (Italics supplied.)

12. On January 9, 1945, Daines became dizzy and a little faint while driving to work and thereupon went to a hospital and put himself under Dr. Fisher's care. Before Dr. Fisher saw him, an electrocardiogram was made at the instance of a hospital intern, which cardiogram was submitted to Dr. Fisher later in the same day. Dr. Fisher found no clinical symptoms or evidence on the electrocardiogram of myocardial damage or heart pathology, or coronary disease, and gave no medicine or treatment for Daines' heart; he diagnosed Daines' condition as faintness or mild vertigo due to hyperacidity of the stomach, the equivalent of seasickness, and on the following day found that the symptoms had cleared up and released Daines from the hospital and sent him back to work. At that time Dr. Fisher told Daines that his condition had no relation to his heart. Daines' stay in the hospital was from

the forenoon of January 9, 1945, until the early afternoon of January 10, 1945, during which time he suffered no pain and was given no treatment or medicine other than nembutal to make him sleep.

13. *At no time prior to the day of his death did Daines complain of his heart or of pain in his heart; he appeared to be in good health, and after being examined by plaintiff's physician on August 3, 1945, for the insurance now in question expressed gratification on the fact that he was in excellent health.*

14. The indisposition of Daines on January 9, 1945, was temporary and trivial in character.

15. Daines had had no periodic or occasional health examinations prior to August 3, 1945, other than those in connection with the illnesses disclosed in his answer to question 18 in Part 2 of his said written application for insurance.

16. Daines had not had health examinations prior to August 3, 1945, within the intendment of question 11 of Part 2 of said written application.

17. Prior to August 3, 1945, Daines had not had or been told he had fainting spells or dizziness, other than in connection with his temporary and trivial indisposition on January 9, 1945.

18. The answers made by Daines to questions 11, 12, 13, 14 and 15 in Part 2 of his said written application for insurance are truthful answers.

19. Question 16 of Part 2 of said written application, as well as the headings of the columns appearing thereunder, are in the form prepared by plaintiff, and the details which appear in said columns are in conformity with the respective headings and are true and sufficiently complete.

20. On August 3, 1945, Daines had recovered from the illness or condition of duodenal ulcer aforesaid, without complications, and Dr. N. F. Fisher was the only physician consulted by him for such illness or condition.

21. None of the questions appearing on Part 2 of said written application required Daines to give the name of any hospital in which he had been under observation or treatment, or to specify the nature of any special examinations—including electrocardiograms—which he had undergone.

22. Question 19 of Part 2 of said written application was intended to cover statements offered by the prospective insured on subjects other than those as to which information was called for by the preceding questions appearing on said application, and the information and statements which follow said question 19 are surplusage inasmuch as Daines' answers to questions 12, 13, 14, 15 and 16 are complete in themselves.

23. Neither on August 3, 1945, nor at any time prior thereto did Daines know that he had a coronary and a heart condition, or an ailment of the heart and coronary arteries.

24. Neither on August 3, 1945, nor at any time prior thereto did Daines have a coronary and a heart condition, or an ailment of the heart and coronary arteries.

25. On August 3, 1945, Daines was in good health and so far as he had knowledge or information believed that he was in good health.

26. In answering the questions in Part 2 of said written application for insurance, Daines made no false material representations.

27. Daines did not intend to mislead or defraud plaintiff by his answers to the questions in Part 2 of said written application for insurance.

28. In answering the questions in Part 2 of said written application for insurance, Daines did not knowingly withhold from plaintiff any information which the form and nature of the questions required to be disclosed.

29. *Had plaintiff requested of Dr. Fisher a history of Daines' illnesses, condition, examinations and treat-*

*ments, it would have been informed of the electrocardiograms taken under his direction, and that in Dr. Fisher's opinion they were within normal limits and did not reveal a heart pathology, and Daines was not suffering from any disease of the heart.*

30. In connection with his application to plaintiff for insurance, and as a part thereof, Daines furnished to plaintiff a letter from Dr. Fisher, dated July 11, 1945, and being defendant's Exhibit B, wherein Dr. Fisher stated:

"Mr. Leo Daines was under my care in June 1941. Examinations revealed a duodenal ulcer which responded very well to treatment, leaving him apparently free from symptoms except for an occasional return of symptoms of a hyperacidity."

Plaintiff did not attach said letter to the policy which it issued, as part of the application therefor.

31. There is no proof in this case that if plaintiff had been informed that Daines had been in the hospital and while there electrocardiograms had been made on March 17, 1943, and on January 9, 1945, or had seen the electrocardiograms and hospital records, or had known the particulars of Daines' indisposition (including becoming dizzy and a little faint) on January 9, 1945, it would not have issued the policy of insurance now in question.

### *Discussion* [1]

The harshness of the doctrine of warranties in life insurance policies was offset by the Act of June 23, 1885, P. L. 134. Under this act immaterial representations would not breach the warranty clause of the policy. This act provided that a policy of life insurance should not be forfeited on account of incorrect statements of the applicant (insured), if such statements were immaterial to the risk and innocently made:

---

[1] This section of the opinion is largely a quotation from or summary of Golden: The Law of Insurance in Pennsylvania (2nd ed.), paragraphs 284-289, pp. 182-187.

Rigly v. Metropolitan Life Insurance Co., 240 Pa. 332; Keatley v. Travelers Insurance Co., 187 Pa. 197.

This act was repealed by the Insurance Act of 1911. However, as a matter of policy the life insurers have made the answers to the application questions as representations instead of warranties. The Act of 1885, as above noted, was reënacted as to health and accident insurance by The Insurance Company Law of May 17, 1921, P. L. 682, and was referred to in one case as though it referred to life insurance: Baxter v. New York Life Insurance, 115 Pa. Superior Ct. 287.

A new act was passed clarifying the situation in Pennsylvania, relative to representations and warranties in life insurance, etc. The Act of May 21, 1937, P. L. 774, 40 PS §512(a) follows:

"That all statements made by the applicant for an annuity or pure endowment contract, or statements made by the insured or in his behalf in the negotiation for a policy or certificate of life, endowment, accident or health insurance, or any reinstatement thereof issued by any insurance company, association, fraternal benefit society, beneficial society or exchange doing business in this Commonwealth, shall be deemed, in the absence of fraud, *to be representations and not warranties.*"

Prior to this act, the turning point from the harsh doctrine of fraud, by reason of immaterial representations and warranties as being fatal for the insured to recover under his policy was made in the case of Suravitz v. Prudential Insurance Co., 244 Pa. 582, L. R. A. 1915 A 273:

In that case the applicant was an illiterate foreigner, unable to speak the English language. The agent of the insurer incorrectly wrote answers to the application for a policy, stating that the applicant had no present disease or never had any. The plaintiff was allowed to show that the answers were correctly given but not recorded correctly, and the issue of good faith

on the part of the applicant was held to be for the jury. This was based on the doctrine of estoppel and the expression of opinion as to health is false only if made with intent to defraud. *Misrepresentations, fraud* and *materiality* must be proved by the insurer.

The leading case on the question of *representations* and *fraud* (italics ours) is the case of Evans v. Penn Mutual Life Insurance Co., 322 Pa. 547, which in an elaborate, scholarly and masterful opinion by Justice Drew, laid down a resume of the basic principles covering representations in Pennsylvania, as they pertain to life insurance, and in order to set forth these principles, extensive quotations will be used from this case, with decisions that followed since the Evans case was decided.

In our recent cases, however, it has been made very clear, at least since Suravitz v. Prudential Insurance Company, 244 Pa. 582, that, where the statements are made representations, the test for recovery is *the good faith in making them:* Stein v. New York Life Ins. Co., 319 Pa. 225; Lilly v. Metropolitan Ins. Co., 318 Pa. 248; Kuhns et al. v. New York Life Ins. Co., 297 Pa. 418; Livingood v. New York Life Ins. Co., 287 Pa. 128.

Our appellate courts have interpreted this provision in the act to mean that a misstatement to avoid the policy *must not only be of fact,* but also *knowingly,* that is fraudulently made: DeRosa v. Equitable Life Assurance Society, 153 Pa. Superior Ct. 33.

Thus a proven mistake in the information given in the application does not work a forfeiture in the absence of fraud.

If the insured honestly believes that the statement was true, a recovery may be had on the policy: Kuhns v. New York Life Insurance Co. and Livingood v. New York Life Insurance Co., supra.

The insurer (plaintiff in the instant case) must thus establish, in order to avoid the policy in the case of representations, that the statements *relied on were*

*falsely and fraudulently made.* (Italics supplied.) It is sufficient to show that they were false in fact and that the insured knew they were false when he made them: Evans v. Penn Mutual Life Insurance Co., 322 Pa. 547; Prudential Insurance Co. v. Adamshick, 150 Pa. Superior Ct. 222.

*Good faith is the touchstone for answers in an application for life insurance:* Guardian Life Ins. Co. v. Clum, 106 F.(2d) 592.

### Good faith of insured

In the case before your chancellor, the circumstances did not require that the insured (Leo A. Daines) pass a physical examination before he could obtain employment—he was already in the employ of defendant (Heppenstall) for *over 20 years,* and several of its key executives were all insured by defendant company, and the record is replete with evidence that Leo A. Daines was a successful executive—always full of energy—very active—always traveling—that he ate at hotels, Pullmans, etc. (probably the reason for his condition of hyperacidity—stomach ulcers), and that up to the very day of his death, neither he nor his wife knew he was suffering a cardiac ailment.

In view of the basic principles set forth by Justice Drew in the case of Evans v. Penn Mutual Life Insurance Company, supra, and set forth in detail hereafter, what proof has plaintiff (Travelers Insurance Company) submitted to your chancellor to justify the cancellation of the policy of insurance issued upon the life of Leo A. Daines?

Plaintiff offered in evidence—with no objection—the paragraphs of the bill of complaint relating to the business of plaintiff and defendant and that a policy of life insurance in the amount of $50,000 was issued upon the life of Leo A. Daines—naming defendant, Heppenstall Company, as beneficiary. The premium on said policy was paid by defendant.

Plaintiff, however, seeks cancellation of the above insurance policy on the ground that it was procured by Leo A. Daines, the insured, by means of *untrue statements and concealment of material facts* in his answers to questions 11 to 16 and question 18 in Part 2 of the application.

Let us resolve the issues in dispute. What is question 11?

*Question 11:*

"Have you had periodic or occasional health examination?"

"Has any abnormal condition been found?"

To both parts of this question the insured answered "No".

We all recognize that a periodic or occasional health examination, of course, is an examination *other than* an examination for an illness, and there is no proof (burden on plaintiff) that Daines ever was examined except in connection with his illnesses. That Daines understood the question to exclude examinations in connection with illnesses is demonstrated by his answers to questions *12, 13 and 14* in which he made full disclosures of incidents which necessarily involved medical examinations. *If these presented an inconsistency to the plaintiff, it was at liberty to make further inquiry.* This was ample and sufficient notice to plaintiff. With the name and address of the attending physician (Dr. Fisher, Chicago, Ill.) the way was open to plaintiff to ascertain from Dr. Fisher every fact it wanted to know concerning Daines: X-ray, electrocardiograms, surgical and medical treatments, hospitalization, illness, and condition of health. It did not choose to make further inquiry and hence, cannot be held to have been deceived, especially as all of Daines' answers were true, and the form of application used by the company did not require him to supply any further particulars.

*Question 12* is:

"Have you ever had any special examination such as X-rays, electrocardiograms, sputum or blood studies?"

Daines' answer to this question was "Yes".

Under the evidence before your chancellor this answer is true. Plaintiff's real complaint is that the insured should have done what plaintiff itself failed to do, namely, subdivide this question into four parts (just as plaintiff subdivided questions 10, 13 and 15), answer each part separately and then enlarge upon the answers in the space available in questions 16 and 19 and possibly attach copies of electrocardiograms, X-rays and special studies to the application. Neither the form of the application as plaintiff prepared it nor the law itself requires any such detailed answers. Had plaintiff desired these particulars it should have worded the form of application accordingly, and this it did not do.

*Question 13* is:

"Have you received: (a) Surgical advice or attention? (b) Medical advice or attention within five years?"

The applicant answered both parts "Yes". These answers are true.

*Question 14* is:

"Have you ever been under observation or treatment in a hospital, sanitarium or other institution?"

The answer is "Yes". This answer is true.

The material parts of question 15 are "Have you ever had or been told you had: (B) Epilepsy, fits or convulsions, fainting spells, dizziness, mental disorder, paralysis, neurasthenia or nervous disorder? (C) Disease of the heart, kidneys or blood vessels?" The insured answered both parts of this question "No". His answer to part (B) is not completely accurate in that he had become dizzy and slightly faint on January 9,

1945, because of his condition of hyperacidity; much like sea sickness, his physician said, and under the well-settled rules of law and decisions of the appellate courts of this Commonwealth, cited supra, Daines' failure to reveal it did not constitute a misrepresentation. The insured's answer to subdivision (C) is true. Plaintiff had hoped to prove otherwise, and relies upon a conjectural statement placed by an intern upon a hospital record before the electrocardiogram was taken ("possible coronary"); but Daines' attending physician, after examining the clinical symptoms and the electrocardiograms, diagnosed Daines' condition, on one occasion, as a duodenal ulcer and on the other as a hyperacidity, and testified explicitly that the electrocardiograms showed no abnormality or *evidence of heart pathology or myocardial damage.* Further, *the attending physician testified that at no time had he told Daines that the cardiograms showed heart pathology but had told him expressly that his condition had no relation to his heart. The result of all this is that Daines told the utter truth when he answered that he never had had or been told that he had any disease of the heart.*

Question 16 is headed: "Give details of all affirmative answers applicable to questions 6-15B inclusive." If there were no restrictions to this instruction an applicant would need to state, if, for example, he had answered question 6 affirmatively, how many drinks of what alcoholic or malt beverages, including the brand, he had ever used, to permit the insurance company to determine whether the use was excessive; and if question 9 had been answered affirmatively (as it was in this case), to state exactly what modifications or restrictions of diet he had followed; and to state similar details of every affirmative answer to the remaining questions.

The company, however, wisely specified and restricted the details to be given, by placing on the form

of application the following subheadings under question 16: "Illness or condition?" "Duration?" "Complications?" "Number of attacks?" "Have you recovered?" "Give full name and address of all physicians consulted?" Daines gave the details as limited by these subheadings, *and his answers are true and sufficiently complete to require the insurance company to seek additional information, had it wanted it.* The X-rays, electrocardiograms and studies made of Daines were part of the routine followed by Dr. Fisher in treating the duodenal ulcer, the illness or condition which Daines had. Daines was not required, by the wording of the subheadings, to reveal the name of the hospital, and from such answers and information as did appear on the application plaintiff could have learned from Dr. Fisher what hospital it was, if plaintiff had deemed it important.

Question 18 is: "Are you in good health?" The answer is "Yes." The evidence is overwhelming that Daines had every reason to believe that he was in good health on August 3, 1945, and that he was in fact in good health. He had entered upon a new and important work in trying times, and was vigorously performing his tasks. Dr. Fisher's letter of July 11, 1945, and the testimony of Mrs. Daines, Ritenbaugh, Chase and Heppenstall clearly establish the fact of his good health, and *plaintiff's own examining physician, Dr. John L. Humphreys, found Daines to be in good health when the policy was applied for.*

Plaintiff in its effort to establish the falsity of insured's answers to the application for insurance offered the deposition of Dr. George K. Fenn taken December 19, 1946, at St. Luke's Hospital, Chicago, Ill.

Dr. Fenn, relied upon by plaintiff as one of its most important witnesses, testified:

"Q. Are you connected with any hospitals?

"A. St. Luke's Hospital.

"Q. In Chicago, Illinois?

"A. Yes, sir.

"Q. Are you connected with the heart department?

"A. Yes.

"Q. In what capacity?

"A. I interpret electrocardiograms."

Shown several cardiograms and identified as those of Leo A. Daines, he was further asked:

"Q. When does that show it was taken?

"A. It is dated March 17, 1943.

"Q. And by what doctor does it show that he was referred?

"A. Dr. N. F. Fisher."

In further questioning, Dr. Fenn testified:

"Q. The clinical diagnosis was stated as 'possible coronary'. You made that diagnosis?

"A. *No, sir*.

"Q. Who did?

"A. I don't know. I assume it was made by the attending physician.

"Q. Well, wasn't the report interpretation made by you altogether?

"A. No, sir. Do you want me to explain that to you?

"Q. Yes.

"A. When a patient is sent to the laboratory for an electrocardiogram they bring a requisition with them. That requisition asks for certain information, and among the items it asks for is a *clinical diagnosis* (italics ours). The clinical diagnosis is made by someone outside the laboratory and sent in, and then it is printed or typewritten on the report."

Dr. Fenn further testified on cross-examination:

"Q. Now when you made the comment, 'curve is consistent with myocardial pathology', is it your opinion that the electrocardiogram does in fact show any pathology?

"A. No, sir, I did not say that. I cannot as a rule make a diagnosis of a cardiac condition on an electro-cardiogram.

"Q. *You are merely aiding—*

"A. *That is right.*

"Q. *——the doctor who is in charge?*

"A. That is right."

Plaintiff called as a witness Dr. Harry E. Canter, Pittsburgh, Pa., and offered to prove by him that the cardiograms in evidence showed a heart condition—which plaintiff's previous witness, Dr. Fenn, *refused to do.* In the absence of proof that Daines had been informed that the cardiograms showed a heart condition, your chancellor sustained defendant's objection to his testimony. Your chancellor also reserved his ruling on defendant's counsel's objection to the admissability of a cardiogram taken of Leo A. Daines in October 1945, which was subsequent to the issuance of the policy of insurance, and your chancellor, following a review of the record, sustains defendant's objection. The record shows that the policy was issued September 22, 1945. Anything that occurred after that in the way of the insured's state of health—X-rays, cardiograms, medical treatments—Daines was certainly under no obligation to inform the company.

That in substance was the testimony offered by plaintiff, The Travelers Insurance Company.

Defendant submitted the following evidence at the hearing before the chancellor:

Harry H. Chase testified that as an insurance agent he obtained the application of Daines for the policy in suit; that Daines told him that he (Daines) had had an ulcer condition and had been treated by Dr. Fisher; that he (Chase) asked Daines to get a statement from the doctor; that Daines obtained the statement (Exhibit B); that he (Chase) submitted it to various insurance companies to which Daines was

then applying for insurance, including plaintiff company.

Defendant offered in evidence the deposition of Dr. N. F. Fisher. Dr. Fisher testified as to his qualifications; that he knew Daines professionally from 1941; that Daines at that time complained of gas in the stomach, with burning, a few hours after eating; that his tentative diagnosis was duodenal ulcer; that Daines refused to have an X-ray taken; that he prescribed Sippy diet powders, to which Daines responded perfectly; that thereafter he would see Daines for an upset stomach once in a few months; that Daines came under his care for an acute appendix; that at Dr. Fisher's direction, Dr. Morrow removed the appendix; that Daines returned to the hospital in June 1941 for X-rays and general observation; that his diagnosis was a healed ulcer; that he next saw Daines on March 17, 1943, when at his insistence Daines had an electrocardiogram; that the purpose of the electrocardiogram was to check his diagnosis; that Daines was only in the hospital for the tests; that in his (Dr. Fisher's) opinion the electrocardiogram taken in March 1943 did not show abnormality or pathology and was not outside normal limits; that he confirmed his prior diagnosis of duodenal ulcer; that a duodenal ulcer may have flairups of hyperacidity which give the same symptoms as an ulcer; that he saw Daines on January 9, 1945, at St. Luke's Hospital; that his complaints were of dizziness, a sort of blacking out; that the intern who received Daines put on the record, "A possible coronary thrombosis", and that thereafter an electrocardiogram was taken at the instance of some intern; that Daines said that he was driving and just wasn't sure of himself and a little faint, having hurried with his breakfast; that he (Dr. Fisher) saw the cardiogram, which didn't impress him; *that the statement of possible coronary was not his diagnosis;*

that he would call the condition which Daines had on January 9, 1945, an acute or mild vertigo, on symptoms of a hyperacidity, a faintness on that basis; that he found no evidence of myocardial damage on any of the electrocardiograms; that they were all within normal limits; that he did not tell Daines that the electrocardiogram showed heart pathology and would not limit Daines' work with any such statement; that on January 9 and 10, 1945, he gave Daines no medicine or treatment for his heart, but Daines had "nembutal" at night to make him sleep; that when Daines left the hospital on January 10, 1945, he was able to resume his employment, the general condition of his health was as good as ever, and the symptoms had cleared up sufficiently; that he didn't even tell Daines to rest at home; that *if there had been any question about his heart he would have put Daines to bed for a month; that he found no clinical symptoms of a heart condition; that at the request of Daines in July 1945 he gave him a letter with reference to his care of him for the duodenal ulcer.*

On cross-examination, Dr. Fisher testified that he would not make a final diagnosis on an electrocardiogram alone or on a patient alone, but that they both must fit together; that he went over the cardiograms (not the hospital records) with Daines and told him what they showed; that Daines on January 9, 1945, complained of dizziness while driving; that he stopped the car a time or two and then went to a garage; that he did not receive from Daines any history of pain; that Daines complained of slight diarrhea that night and nausea and vomiting; that pain is often a symptom of coronary and that is what the intern figured; that the notation on the electrocardiogram of January 9, 1945, "Clinical diagnosis possible coronary" was put on there by the intern when he sent the requisition for an electrocardiogram; that he (Dr. Fisher) disregarded the report attached to the cardiogram of Janu-

ary 9, 1945; that he did so because Dr. Gilbert had said, "That shouldn't have been sent out", but the only reason that they had to say that was a decreased T wave and that a lot of people may have more than that; that they have got to have clinical symptoms with it; *that if he (Dr. Fisher) had thought that Daines had coronary disease he would not have sent him back to work the next day, for there would have been a therapeutic test; that his diagnosis was hyperacidity and mild vertigo, the same as seasickness; that Daines knew what the cardiograms (not the notation) made January 9, 1945, showed; that he (Dr. Fisher) told Daines what they showed, but didn't tell him that he had myocardial pathology; that he wouldn't worry the man if it wasn't true.*

On redirect examination Dr. Fisher testified that he discussed the electrocardiogram with Mr. Daines in January 1945; that he told Daines in January 1945 that his condition had no relation to his heart and that he shouldn't worry about the dizziness; that he thought Daines was off his diet over the New Year, and that Daines left the hospital without any medicine or limitation of activity being prescribed.

George F. Ritenbaugh testified that in the summer of 1945 he, as one of the executives of Heppenstall Company, was being insured; that he and Daines went to the office of Dr. Humphreys in the Reliance Life Insurance Company's office for examination; that Daines was examined first; that on August 3, 1945, Daines was in good health, and that immediately after the examination he and Daines congratulated each other on the fact that they were both in excellent health.

Mrs. Grace Daines testified that she was the wife of Daines; that she recalled the day he went to St. Luke's Hospital in January 1945; that they were then living in Chicago; that Daines was the Chicago

representative of Heppenstall Company; that on that day he left the house rather late, sometime around 9:30 to 10 in the morning, because their little girl had been ill; that she saw Daines that morning and the night before and that he looked exceptionally well that morning; that he had made no complaints that morning or the night before; that she heard from Dr. Morrow that her husband was in the St. Luke's Hospital; that Dr. Morrow told her not to come down to the hospital and that Daines just wanted to lie down; that Daines came home the next afternoon about 4 o'clock; that he did not go to bed or take any medicine, but sat down as usual and read the newspaper, had dinner and was just as he usually was; that at the time of the examination for the insurance in suit the family had moved from Chicago; that she knew that Daines intended to be examined; that at that time he was, just as always, full of energy; that there was nothing to indicate that he was not in good health; that the afternoon of the examination he came home and said, "I sailed right through that examination" and that they could not find anything wrong with him; that he never complained to her about his heart or any pain in the heart region, nor did he discuss his stomach; that he did have gas, especially after trips and being away for a few days; that after his hospitalization for one day in January 1945 he was active up until the time of his death; that he was always too busy to take any particular care of himself and always so strong that he didn't seem to need it; that he took many trips in his work and worked regularly and had no illness.

Robert B. Heppenstall testified that he is the president of Heppenstall Company; that Daines was employed by that company from 1923 or 1924 to the date of his death; that he had been stationed in Chicago approximately 19 years; that Daines came to Pittsburgh in 1945; that he saw Daines regularly except when he or Daines was absent from the city; that

Daines' appearance so far as indications of health went was excellent at all times and at the time he was examined for insurance; and that Daines never complained about his health, or of pain around the heart, or about his heart.

### Question involved

The issue clearly resolves itself as to whether certain answers made by Leo A. Daines, insured, *are all and singular representations material to the risk,* the falsity of such would under law justify the chancellor to annul and cancel the policy of insurance numbered 2,329,360 issued on the life of Leo A. Daines.

### Argument

In the opinion of your chancellor plaintiff has not met the burden of proof, in order to avoid the policy in the case of representations as here, that the statements of Leo A. Daines, insured, which were *relied on* were falsely and fraudulently made.

The question of the materiality of the statements with regard to the risk involved is a relevant matter for consideration in determining whether a false answer was made *with intent to deceive* (italics ours). When the applicant states he is in good health and believes it to be so, though in fact he is suffering from some insidious disorder or latent disease of which he is not aware, *a recovery may be had:* Evans v. Penn Mutual Life Insurance Co., supra; Livingood v. New York Life Insurance Co., supra; Baer v. State Life Insurance Co., 256 Pa. 177; Feinberg v. New York Life Insurance Co., 256 Pa. 61; DeRosa v. Equitable Life Assurance Society, 153 Pa. Superior Ct. 33.

*"Material to the risk"* means that if the insurer knew the real facts it would not have accepted the loss or taken it unless a higher premium were paid: Watson v. Metropolitan Life Insurance Co., 145 Pa. Superior Ct. 369; Verbich et ux. v. Greek Catholic

Union of Russian Brotherhoods of U. S. A., 137 Pa. Superior Ct. 64.

Plaintiff's counsel states that he intended to show that had the insurance company (plaintiff) known that Daines had had "cardiograms" made and had been in St. Luke's Hospital the company *could* have made what investigation it deemed fit. However, no evidence was submitted of what action the company would have taken if it had been informed by Dr. Fisher that electrocardiograms had been made, *that they were within normal limits and that Daines did not have a heart condition, but was a good insurance risk.*

Testimony of Dr. Fisher:

"Q. Then the diagnosis of possible coronary, which appears on the record in connection with the electrocardiogram of January 9, 1945, is not your diagnosis?

"A. Absolutely not.

"Q. What was your diagnosis of the condition which Daines had on January 9, 1945?

"A. I would call it an acute or mild vertigo on symptoms of a hyperacidity. In other words they may get a faintness on that basis.

"Q. Now on this visit to the hospital on January 9th and 10th, 1945 did you give him any medicine or treatment?

"A. Not for any heart. He had something for his dizziness. I forget what we ordered there.

"Q. Here is a copy of the record. (Hands document to the witness).

"A. I know he didn't have any heart medicine. The intern ordered some nembutal at night, to sleep. No.

"Q. Well, when he left the hospital on January 10th, 1945, was he able to resume his employment?

"A. Absolutely.

"Q. And what was the general condition of his health at that time?

"A. Said as good as ever.

"Q. Yes?

"A. Symptoms had cleared up sufficiently that I didn't even tell him to rest at home.

"Q. Yes?

"A. If there was any question of any heart, I don't care if you have no pain or evidence here, I mean if your electrocardiogram is negative and he clinically had the symptoms, I would have put him to bed for a month.

"Q. Well, do you accept Dr. Gilbert's report and interpretation, or do you make your own?

"A. Well, I will put it this way, I wouldn't make a final diagnosis on an electrocardiogram alone, on a patient alone. They have both got to fit together. Now I accept his findings if it fits in with the clinical picture of my patient.

"Q. Then did you say he did or did not object to having cardiograms made January 9, 1945?

"A. He did not, no, no.

"Q. Did he know what they showed?

"A. Yes.

"Q. Did you tell him?

"A. Yes. I didn't tell him that (indicating), that he had myocardial pathology. I wouldn't worry the man if it wasn't true.

"Q. Why did you refer him for cardiograms on October 10th, 1945?

"A. To prove that they were wrong on January 9th, 1945.

"Q. You mean to see whether or not they were wrong?

"A. That is right, and they were.

"Q. Was his heart enlarged at all?

"A. No, not from the fluoroscopy or the X-ray that he had. You see, you get an X-ray of that too when you have a stomach X-ray.

"Q. Now what was it that you told him in January 1945 as to what these electrocardiograms showed and what his condition was then?

"A. I told him I thought it had no relation to his heart and I wouldn't worry about the dizziness.

"Q. Yes?

"A. And I thought he was off his diet, which he admitted he was, over the New Year.

"Q. Yes. And then he left the hospital without any medicine to take?

"A. No medicine. No limitation of activity."

Testimony of Mrs. Grace Daines:

"Q. How did he appear to you?

"A. He was just as always; full of energy.

"Q. Was there anything about him to indicate that he was not well or not in good health?

"A. Not a single thing. . . .

"Q. Or about having any pain in the heart region?

"A. No; never.

"Q. Did he ever discuss his heart with you?

"A. I would say no. His stomach, yes. . . .

"Q. He did have gas, I suppose?

"A. Especially after trips, in Pullmans and being away on hotel food for a few days."

The record clearly convinces your chancellor that Dr. Fisher's letter (defendant's Exhibit "B") was a part of the application for the policy involved in this suit, that plaintiff relied on Dr. Fisher's letter, together with its own physician's (Dr. Humphreys) examination of Daines before the issuance of the policy, and plaintiff not having attached the same to the policy, the part of the application which was attached to the policy did not become a part of said policy.

Your chancellor firmly believes from the uncontradicted and reliable testimony of defendant's witnesses: George F. Ritenbaugh, Mrs. Grace Daines and Robert B. Heppenstall that Daines, a dynamic and energetic business executive, believed himself to be in excellent health and that he never complained of any pain in the heart region, except his hyperacidity (duodenal

ulcer) from which many energetic executives in present-day business life suffer, and your chancellor recognizes the applicability of a quotation of the late Justice Cardozo of the United States Supreme Court: "Courts are not to shut their eyes to the realities of business life."

Your chancellor finds from the record that Daines made no material misrepresentations. As stated in an early portion of this opinion and referred to with frequency the basic principle controlling in the instant case is summarized by Justice Drew in the Evans case, supra, wherein the court said:

"These principles may be summarized as follows: (1) Where the statements made by insured in the application are warranted by him to be true, or where the policy expressly provides for its avoidance by the falsity of such statements, the insurer may avoid the policy by showing the falsity of statements material to the risk, irrespective of insured's knowledge of their falsity or of his good faith in making them. (2) *Where the statements are made representations, the insurer, to avoid the policy, must show they are false and insured knew they were false or otherwise acted in bad faith in making them.* (3) If such falsity and the requisite bad faith affirmatively appear (a) from competent and uncontradicted documentary evidence, such as hospital records, proofs of death, or admissions in the pleadings, or (b) from the uncontradicted testimony of plaintiff's own witnesses, a verdict may be directed for the insurre. (4) But whenever disputed questions of fact are presented by conflicting evidence, whether documentary or oral, or whenever the insurer's defense depends upon the testimony of its witnesses, even though such testimony is uncontradicted, the case must be submitted to the jury, subject to the trial court's power to award a new trial as often as in its sound discretion it may think the interests of justice require. (5) When the suit is in equity, the

chancellor is the sole trier of fact, and submission to a jury is not required except where he deems it advisable." (Italics supplied.)

At page 553, the court said:

"The insurer must thus establish, in order to avoid the policy in the case of representations, that the statements relied on were falsely and fraudulently made. . . ."

and at page 554:

". . . The question of the materiality of the statement with regard to the risk involved is a relevant matter for consideration in determining whether a false answer was made with intent to deceive. *When the applicant states he is in good health and believes it to be so, though in fact he is suffering from some insidious disorder or latent disease of which he is not aware, a recovery may be had: . . .*" (Italics supplied.)

In his application in the Evans case, supra, Evans stated that he had never been disabled nor had any medical or surgical treatment. He had had a dislocated cervical vertebra for which he had consulted osteopaths and which sometimes resulted in temporary paralysis, which cleared up within 24 hours and left him in an apparently normal condition. His death resulted from a dislocation of third cervical vertebra while swimming. Justice Drew, at page 563, quotes the opinion of the lower court as follows:

" 'Nowhere is it shown that Edward W. Evans knew, or was told by any of the doctors who attended him, that his affliction was a serious one. Indeed the testimony shows that his neck treatments were few and when that condition was rectified he had prompt recovery and immediately thereafter engaged in his work.' "

Among the many appellate decisions cited in this opinion—we repeat two of them—Haag v. Prudential Insurance Co. of America, 348 Pa. 614, in which the applicant for insurance did not know that he had cancer

of the colon, but had seen doctors for what appeared to be indigestion and gas pains, and Suravitz v. Prudential Insurance Company, supra, "in which the applicant for insurance did not know that she had latent organic heart trouble."

In the instant case, even if Daines had a heart condition (certainly disputed by his *doctor*, *his wife* and his *associates*) and plaintiff offered no proof that he did have a cardiac disturbance, nevertheless, the evidence is uncontradicted that he did not know that he had it but thought himself to be in good health. This being so, he obviously made no *misrepresentations* and was guilty of no fraud.

Plaintiff relies principally upon the law laid down by the Superior Court of this Commonwealth in the case of Walter v. John Hancock Mutual Life Insurance Co., 160 Pa. Superior Ct. 532, decided on April 16, 1947. In this case the facts as related in the opinion of Judge Reno, are as follows:

"This action in assumpsit by the beneficiary in a life insurance policy is here upon plaintiff's appeal from the refusal of the court below to enter judgment n. o. v. in her favor. She sued for the amount of the policy, $1,000, but the trial judge, sitting without a jury, sustaining the defense that the issuance of the policy had been induced by false and fraudulent representations, entered a verdict for the return of the premiums amounting to $35.28.

"The policy was issued on March 22, 1943, and insured died August 8, 1943. In the application, the insured stated that her answers therein were 'complete, true and correctly recorded'. The questions and answers pertinent to this issue are: '15. Have you ever had, or consulted or been treated by a physician or other practitioner for any of the following: Epilepsy, insanity, paralysis, discharging ear, goitre (follows a list of diseases not material here) or any other illness, injury, deformity, physical defect, impairment,

or infirmity, or any surgical operation?' Answer: 'Yes.' '17. Have you consulted or been treated by a physician or other practitioner during the past five years?' Answer: 'Yes.' '18. Have you ever received, or applied for treatment at, or attended, any hospital, dispensary, sanitarium, cure, or other institution?' Answer: 'Yes.' To an unnumbered question: 'If the answer to any or all of questions 15, 16, 17, and 18, is "Yes", specify every illness, injury, deformity or operation, with dates, duration, severity, results, the names and addresses of any physicians or other practitioners, and hospitals, etc.' She answered: 'Thyroidectomy, toxic goitre, Sept. 1942. Memorial Hospital, 4 weeks, toxic symptoms have disappeared since operation, fully recovered.'

"The facts, established by defendant and not denied, are that on March 15, 1940, the insured was treated by Dr. Mary R. Curcio for hypertension and menopause; on September 23, 1941, for adeno-carcinoma of the ovary; and on September 18, 1942, for hyperthroidism. She was also treated by Dr. James A. Lehman on September 28, 1941, for carcinoma of the ovary, and on October 8, 1942, for hyperthyroidism. *The insured therefore omitted the names of two physicians and four treatments, including at least two for such a serious ailment as carcinoma of the ovary.* (Italics ours.)

"All the questions raised in this appeal were recently decided adversely to appellant in Glaser v. Prudential Ins. Co., 157 Pa. Superior Ct. 471, 43 A. 2d 534, where Judge Ross thoroughly collected and applied the leading cases. *The questions relating to the medical history of the insured, and the names of physicians whom she consulted and by whom she was attended, were material to the risk, and her incomplete and therefore false answers permitted defendant to avoid the policy.* She had knowledge of the correct answers to the questions and she was required to impart

that knowledge completely and correctly to the insurer." (Italics ours.)

But the Walter case (above) is clearly distinguished from the instant case, for in the Walter case the proof submitted showed conclusively that the applicant's representations were so *glaringly false as to be fraudulent.* Martha E. Walter failed to disclose the names of two physicians who had treated her and four treatments she had received including at least two treatments for so serious an *ailment as carcinoma* (cancer) of the ovary. Judge Reno, speaking for the court, held that her incomplete and false answers voided the policy, saying:

"She had knowledge of the correct answers to the questions and she was required to impart that knowledge completely and correctly to the insurer."

In contrast, Daines in the instant case fairly and honestly reported the only illness or disturbance—a duodenal ulcer—which caused him to be treated by a doctor, to be hospitalized, to submit himself to X-rays, electrocardiograms and other studies, and to have occasional symptoms of hyperacidity. He was *not* treated by other doctors, except those who made the cardiograms and X-rays at the special instance and request as associates of Dr. Fisher for it was Dr. Fisher who was his physician and Daines so regarded him. *The chancellor believes and finds that Daines' disclosures were honest and adequate;* were all that he was obliged to make under the requirements of the peculiar and limiting forms of questions contained on the application which plaintiff had adopted for use; and were amply sufficient to point plaintiff to additional inquiries, or to communication with Dr. Fisher, either of which would have produced to plaintiff the complete record and history of just what had occurred throughout Dr. Fisher's care, examinations and treatment of Daines and *your chancellor firmly believes with all that information before the policy was issued, plaintiff*

*would have (as it did) promptly issued the policy of insurance upon the life of Leo A. Daines.*

*The indisposition of Daines in January 1945 was of a trivial character:* The testimony of Dr. Fisher and of Mrs. Daines proves that the indisposition which caused Daines to go to St. Luke's Hospital on January 9, 1945 was trivial. The failure to reveal it in the application (it was in fact revealed in Dr. Fisher's letter as an occasional return of symptoms of a hyperacidity) was not a material misrepresentation.

In the Haag case, supra, Haag did not reveal that he had consulted a number of physicians during several years prior to the application, to remedy what appeared to be indigestion and gas pains. None of the doctors made a thorough diagnosis. The court affirmed a judgment in favor of the beneficiary.

In the Evans case, supra, Evans failed to reveal visits to an osteopath for his dislocated cervical vertebra and treatments by a physician for bronchial inflammation. The court held that the question of good faith was for the jury, there being no evidence that the insured intended to conceal the truth.

In Adams v. Metropolitan Life Insurance Co., 322 Pa. 564, the applicant disclosed in her application that she had been treated by one physician for a hemorrhoid but failed to reveal that she had been treated by another for a different condition. Her doctor testified that her complaints to him were of headache which she called neuralgia. He had not informed her that she had inflammation of the kidney. The court held that in view of this testimony the jury might very well conclude that there had been no fraudulent concealment by insured of *any grave or important serious disease* in the answers concerning her condition of health.

In Kuhns et al. v. New York Life Insurance Co., 297 Pa. 418, Kuhns, a dental student in University of Pennsylvania, had gone to the students' ward of the Univer-

sity Hospital for a rest, and had remained there four days. In his application for insurance he stated that he had not been under observation or treatment in any hospital. He also stated that he had not consulted or been examined or treated by a physician within five years past. He had in fact been treated for *indigestion*, a temporary ailment. It was held that the meaning of the question and the truthfulness of the answer or the presence of an intention to mislead and deceive by the representation, was for the jury. Judgment for the beneficiary was affirmed.

*The company could have made further inquiry:* The answers of Daines to the questions on the application were sufficient to put the insurance company on inquiry if it desired more details. Its agent Chase knew that additional information would be required with reference to the duodenal ulcer, and accordingly had Daines obtain the letter, Exhibit "B", from Dr. Fisher, and delivered it to plaintiff. Plaintiff apparently was satisfied with the information so received and issued the policy. Further inquiry would have revealed nothing detrimental to Daines, and there is no proof that had all the circumstances attending Daines' illness been known to the company the policy would not have been issued.

In DeRosa v. Equitable Life Assurance Society, 153 Pa. Superior Ct. 33, cited earlier in this opinion, an applicant for insurance revealed that she had had a surgical operation for appendicitis by a Dr. Wright, with complete recovery. The answers did not check "squarely" with the facts. The appendectomy had been performed by a Dr. Hornick more than five years before the application. Dr. Wright was the only physician consulted within five years. He had treated her for a fibroid condition of the uterus and had referred her to a Dr. Stewart for X-ray treatment. Judge Hirt in his opinion said (p. 36) :

"In the light of the verdict the inaccuracies in the application must be regarded as innocent and without the intent to deceive. Insured's actual physical condition was known to Dr. Wright, and plaintiff, before receiving the application to be signed by his wife, suggested to Conrad, defendant's agent, that he discuss the question of her health with him. It is admitted that he did inquire of Dr. Wright whether there was any serious ailment and that Dr. Wright said: 'there was nothing detrimental.' *The insurance company in the application had the name of the physician who knew all about the physical condition of the insured.* If he had been consulted by an investigator, in addition to Conrad the soliciting agent, no evidence of serious ailment affecting insurability would have been developed. It is a fact of importance that the testimony established the total absence of carcinoma prior to the application; its inception and development came after the policy was delivered. Dr. Wright and the other medical witnesses were called by defendant and this insurer is bound by their answers. Their testimony is all to the effect that a fibroid condition of the uterus is a benign ailment common in women of insured's age and ordinarily does not affect insurability. The testimony is that this condition did not develop into the carcinoma which resulted in death. In addition, going to the question of good faith, after the policy was issued, plaintiff, having discovered inaccuracies in the application, informed defendant's agent that it was Dr. Hornick who performed the appendectomy in 1929 at Mercy Hospital and not at Lee Hospital and that a 'water tumor' also was removed. It is conceded that the tumor was benign and did not affect insurability after a complete recovery."

At page 39 the court said:

". . . What was said to the agent at the time of the application was merely to urge him to consult Dr.

Wright who had full knowledge of insured's physical condition and of the treatments by physicians. *This information was readily available to the company* since his name appeared in the application. . . ." (Italics supplied.)

In the case at bar, the fact is that by Daines' answers to the questions on the application and Dr. Fisher's letter of July 1945 plaintiff was informed that he had had electrocardiograms and X-rays, surgical advice and attention, as well as medical advice and attention within five years, had been under observation or treatment in a hospital, and had had ulcer of the duodenum. The name and address of the attending physician also was specified. With this information before it, the way was open to plaintiff to ascertain from that physician (Dr. Fisher) every fact it wished to know concerning Daines' X-rays, electrocardiograms, surgical and medical treatments, hospitalization, illnesses and condition of health. It did not choose to make further inquiry, and hence cannot be held to have been deceived, especially as all of Daines' answers were true, and the form of application used by the company did not require him to supply any further particulars.

*Portions of a hospital record are not admissible:* While a hospital record is admissible to prove facts (Freedman v. Mutual Life Insurance Co., 342 Pa. 404, and Richardson v. Alta Life Insurance Co., 153 Pa. Superior Ct. 310, the statements in the record as to impressions, tentative diagnoses and possible diagnoses are certainly objectionable as conjectural and therefore not admissible in evidence. The diagnosis "possible coronary" on Exhibit 5 and parts of the hospital record have been objected to as conjectural by counsel for defendant and should not be considered.

In the Freedman case, the court said:

". . . such records must satisfy three probative requirements: (1) they must be made contemporaneously with the acts to which they purport to relate; (2) there must have been present at the time no contemplative motive for falsification; (3) they must have been made by a person having knowledge of the facts set forth, or one competent to predicate a medical and scientific opinion on the facts."

But it must be a firm opinion and not a guess. See Rich v. Philadelphia Abattoir Co. et al., 160 Pa. Superior Ct. 200, and Elonis v. Lytle Coal Co., 134 Pa. Superior Ct. 264.

*Your chancellor repeats as previously stated that the application is not a part of the policy.*

The letter of Dr. Fisher, defendant's Exhibit "B", was in the possession of the insurance company prior to the issuance of the policy. Its contents were material to and part of the answers to the question in Part 2 of the application, and therefore the letter should be deemed a part of the application for the policy. The law (40 PS §441) requires that a correct copy of the application be attached to the policy if it is to be considered a part of the contract. In the case of Sandberg v. Metropolitan Life Insurance Co., 342 Pa. 326, 328, Justice Drew, again for the court, said:

"There can be no doubt but that when the Act of 1921 requires that a copy of the application be attached to the policy if it is to be considered a part of the contract, the Legislature meant that the whole application, as signed by the applicant, must be attached. A part of the application is not 'the application'. Fidelity Title & Trust Co. v. Metropoltan Life Insurance Co., 305 Pa. 296, 301. And that this is a salutary law is evident when it is realized what injustice might result if it were held that only that part of the application need be attached upon which defendant wishes

to predicate its defense, since, for example, an un-attached part might easily explain apparently fraudu-lent statements made in the attached part. The insured or beneficiary is entitled to have the whole applica-tion before him, if any part of it is to be used against him as a defense. . . ."

In that case an amendment to the application was not attached to the policy as a part of the application. The company was not permitted to use the statements in the original application to defeat an action on the policy.

In the present case the statement of Dr. Fisher brings the medical history of Daines down to the date of the statement and is supplemental to the answers to questions in Part 2 of the application with refer-ence to present health, duration of and recovery from an illness or condition revealed in the application, and medical advice or attention. It amplifies Daines' state-ments in the written application attached to the pol-icy. Unquestionably the company relied on Dr. Fisher's letter, and should have attached it to the policy. Not having done so, Daines' entire application was not attached to the policy, with the result that no part of the application may now be used against defendant.

Your chancellor concludes that the basic principles applicable to the case at bar will be found in the rule of law that where the parties have not made the ap-plicant's answers warranties, but merely representa-tions, the policy can be voided *only* if the answers are knowingly false (Evans v. Penn Mutual Life Insurance Co., supra) or if there is such willful concealment of requested information as to amount to fraudulent misrepresentation (Walter v. John Hancock Mutual Life Insurance Co., supra). The evidence in this case is conclusive and uncontraverted that Daines had never been told he had a heart condition, *and in fact was not suffering from one*. Daines disclosed having had sur-

gical and medical attendance and treatment, as well as X-rays and electrocardiograms. As to these matters, the only detailed information which the company required of him was as indicated by its subheadings under question 16. Question 16 was answered *fully* and with complete honesty. Nowhere did the company request Daines to give the names of hospitals where treated or furnish copies of hospital records or cardiograms, so that his failure to disclose these matters was *neither fraudulent concealment nor fraudulent misrepresentation*. The evidence is clear that his faintness and dizziness, being incidental to a very trivial and temporary indisposition, was not required, under the law, to be reported.

There is a presumption as to the validity and legality of this contract of insurance and the burden is upon the *insurer* (plaintiff company in the instant case) to establish, in order to avoid the policy of representations, that the statements relied on were falsely and fraudulently made, but also that the insured (Daines) knew they were false: Adams v. Metropolitan Life Ins. Co., 322 Pa. 564; Lilly v. Metropolitan Life Ins. Co., 318 Pa. 248; Watson v. Metropolitan Life Ins. Co., 145 Pa. Superior Ct. 369; Equitable Life Assurance Society v. Saftlas, 38 F. Supp. 708.

*The presumption of validity should be more than a pious formula, to be sanctimoniously repeated at the opening of an opinion and forgotten at the end.*

Plaintiff has failed completely to prove that Daines either falsified or fraudulently withheld information. Your chancellor finds that under all the evidence, plaintiff is not entitled to the equitable relief it seeks and that is to rescind, cancel or annul its contract of life insurance in the instant case because of fraud.

### Conclusions of law

1. The indisposition of Daines on January 9, 1945, being temporary and trivial in character, was not a

matter which he was obliged to disclose to plaintiff in his written application for insurance or in his answers to questions 15-B and 16 on Part 2 of said application.

2. Such examinations as Dr. Fisher made of Daines in connection with his illnesses in 1941 and 1943 and his indisposition on January 9, 1945, were not health examinations within the reasonable intendment of question 11 of Part 2 of Daines' written application for insurance.

3. The details called for question 16 of Part 2 of said written application for insurance were limited to those indicated by the subheadings under question 16, and the details given by Daines under said subheadings were adequate and sufficient so far as details of his affirmative answers applicable to questions 12, 13, 14 and 15-D were concerned.

4. None of the questions on Part 2 of said written application required Daines to specify the hospital in which he had been under observation or treatment, or the nature of any special examinations, including X-rays or electrocardiograms, which he had had.

5. Question 19 of Part 2 of said written application did not require Daines to give any details of his affirmative answers to questions 12, 13, 14 and 15 of said application in addition to the details which he gave in answer to question 16.

6. None of Daines' answers to the questions on Part 2 of said written application was incomplete, incorrect, false, or made with intent to deceive plaintiff or to conceal any material fact.

7. The policy of insurance issued by plaintiff on the life of Daines was not procured by fraud, misrepresentation or concealment of any material fact.

8. The policy of insurance issued by plaintiff on the life of Daines is a valid and subsisting contract between the parties thereto.

9. Dr. Fisher's letter, defendant's Exhibit "B", was a part of the application for the policy in suit, and

plaintiff not having attached the same to the policy, the part of the application which was attached to the policy did not become a part of said policy.

### Decree nisi

And now, June 26, 1947, it is ordered, adjudged and decreed:

(1) That the bill of complaint be and the same is hereby dismissed.

(2) That plaintiff pay the costs of this proceeding.